**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| DIANA MEMBRENO, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 19-cv-00369-PX |
| ATLANTA RESTAURANT PARTNERS, LLC, *et al.*, | * | |
| | * | |
| Defendants. | | |

***

**<u>MEMORANDUM OPINION</u>**

Pending in this employment discrimination case is Defendants Atlanta Restaurant Partners, LLC and Jackmont Hospitality, Inc.'s Motion for Summary Judgment.  ECF No. 125. The motions are fully briefed, and no hearing is necessary.  *See* Local. R. 105.6  For the following reasons, Defendants' Motion for Summary Judgment is DENIED.[1]

**I.   Background**

The following facts are construed in the light most favorable to Plaintiff Diana Membreno ("Membreno") as the party challenging the propriety of summary judgment.

**A.   Membreno's Exemplary Employment at Friday's**

In 2007, Membreno, a transgender woman, was hired as a cook at a TGI Friday's ("Friday's") restaurant in Silver Spring, Maryland.  ECF No. 125-2.  The Silver Spring Friday's is owned and operated by Defendants Atlanta Restaurant Partners ("ARP") and Jackmont Hospitality, Inc. ("Jackmont").  ECF No. 125-8 ¶¶ 3–4, 18.

---

[1]   The parties have also requested that the Court seal certain exhibits that include information designated confidential pursuant to the protective order entered in this case.  *See* ECF No. 55.  The Court will grant the motions to seal at ECF Nos. 127 (Defendants' Ex. E and R), 133 (Plaintiff's Ex. 4 and 28), and 142 (Defendants' Ex. AG and AI).

When Membreno first applied to work at Friday's in 2007, she was known to most others as "Diana," but her legal name was Jose Oswaldo Membreno Alvarez.  *See* ECF No. 132-15. During her employment at Friday's, Membreno underwent various gender affirming therapies and procedures to help match her appearance with her identity.  Generally, Membreno did not reveal her transgender status, even to friends.  ECF No. 132-1 at 17; 132-13 at 8–9.  She presented to the world as a woman throughout her employment at Friday's.

Membreno had previously applied to Friday's many times before she was hired.  When she interviewed with Kitchen Manager, Bamba Sama, in 2007, Membreno wore feminine clothing.  ECF No. 132-1 at 9.  The interview appeared to be going well until Sama, seeing Membreno's legal name, asked if Membreno was a man.  *Id.*  After that, says Membreno, she did not hear from him again.  *Id.  See also* ECF No. 132-2 at 10.  A few months later, Membreno applied to Friday's again and was hired.  *See* ECF No. 125-2.

When Membreno was hired, Friday's processed her into its payroll system using her legal name, Jose.  ECF No. 125-8 ¶ 19.  But she asked her co-workers and supervisors to call her Diana.  *See* ECF No. 125-4 at 6–7; 132-2 at 6.  Thereafter, she was listed in the Friday's systems under both names.  ECF No. 125-4 at 6–7.  Membreno formally changed her name to "Diana Membreno" on September 8, 2014.  ECF No. 132-15.

 Throughout her nearly ten years at Friday's, Membreno was an exemplary employee. She had been selected as employee-of-the-month five times.  ECF No. 125-6 at 3–4 .  She was widely considered an exceptional cook, with more knowledge and experience than most other kitchen workers.  ECF Nos. 125-21 ¶ 11; 132-5 at 6–7; 132-10 at 5.  Co-workers regarded her as a "leader" and a remarkably hard worker.  ECF Nos. 132-12 at 6; 132-2 at 18; *see* ECF No. 125-13 ¶ 4.  Regional Director of Operations, Everett Faison, considered Membreno a standout, and

ranked her among his top five employees out of hundreds under his supervision.  ECF No. 132-5 at 5, 7.  Faison, in short, "never ever had a problem with her work performance or her dedication . . . ."  *Id.* at 7.  Likewise, one of Membreno's General Managers, Mark Morris, viewed Membreno as one of the top employees, even recommending that Membreno serve as a trainer at new Friday's restaurants.  *See* ECF Nos. 125-4 at 14; 132-8 at 9.  Another, Kendrick Pittman, also regarded Membreno as a great employee and "had no problems" with her.  ECF No. 132-9 at 7.  He found her to be "really good at her job," reliable, punctual, and "just a good person."  *Id.*  As a result, Membreno had been given opportunities to travel with the company and train others.  *See* ECF No. 125-13 ¶ 4.

Membreno's tenure with the Silver Spring Friday's remained largely unbroken.  However, in 2014, Membreno temporarily relocated to another Friday's franchise for about seven months.  *See* ECF No. 132-14 at 45–51.  Membreno recounts that she left briefly because she had been denied a raise and had a falling out with a Silver Spring Kitchen Manager, Aida Cortez.  *Id*.  Membreno returned to the Silver Spring Friday's within the year.  *Id.*; ECF Nos. 132-19 ¶ 3.

**B. Membreno Suffers Discrimination and Harassment Aimed at Her Gender Identity**

For the lion's share of her time at the Silver Spring Friday's, Membreno suffered all forms of harassment.  ECF Nos. 125-2; 132-1 at 8–11; 132-2 at 18.  When Membreno was hired, then Kitchen Manager Sama was immediately hostile towards her, making derogatory remarks and gestures about her to others.  ECF Nos. 132-1 at 9; 132-2 at 10.  Likewise, the restaurant's General Manager, Headen, consistently treated Membreno poorly on account of her gender identity.  ECF Nos. 132-1 at 8–9; 132-14 at 31–36.  Headen refused to allow Membreno to use the women's restroom and berated her when she would.  ECF No. 132-14 at 31–35.  As a result,

Membreno avoided using the restroom when Headen worked, even going so far as to limit the amount of water she drank while working.  ECF Nos. 132-14 at 34–35; 132-16 ¶ 4.  Headen also regularly "outed" Membreno as transgender to other employees, and she refused to call Membreno "Diana," instead referring to her as "Jose" and using male pronouns.  ECF Nos. 132-1 at 8–9; 132-16 ¶ 7–8.  *See also* ECF No. 132-18 (disciplinary action referring to Membreno by "Jose" and using male pronouns).  In one particularly egregious incident, Headen went so far as to "correct" Membreno's brother, who also worked at Friday's, telling him that Membreno was his brother and not his sister.  *See* ECF No. 132-14 at 36–37.  Headen also purposefully referred to Membreno as "Jose" when setting and publishing the work schedules.  ECF Nos. 132-1 at 8; 132-14 at 41–42.  Headen mocked Membreno to others, insulting her appearance and mannerisms.  ECF No. 132-16 ¶¶ 4-6.  Membreno described this treatment as "inhumane."  ECF No. 132-14 at 32–33.[2]

Roberto Lainez similarly harassed and berated Membreno for years.  Lainez and Membreno began working together as line cooks together in 2008.  *See* ECF No. 125-21 ¶¶ 5, 8.  As Membreno's co-worker, Lainez routinely referred to her by a male name and made derogatory comments about her relationship with her boyfriend.  ECF Nos. 132-14 at 80–82; 132-19.  In 2013, Lainez became physical with Membreno during an argument, aggressively pushing her and yelling, "What is your problem, faggot?" and "You want me to hit you?"  ECF No. 132-14 at 12–14.  Distraught, Membreno reported Lainez to then-Kitchen Manager Carlton Carrol; Lainez was never disciplined.  ECF Nos. 132-14 at 14; 132-1 at 8, 18.  Lainez also

---

[2]       Mistreatment from her coworkers also went unchecked.  Daniella Marin, another cook, often "outed" Membreno to any new employee, especially if a new worker expressed romantic interest in Membreno.  *See* ECF Nos. 132-1 at 10–11; 132-14 at 30.  Marin also told Membreno that she would never be a "woman" and questioned how a man could ever be attracted to her.  ECF Nos. 132-1 at 10; 132-12 at 7.  This harassment went unabated.  *See* ECF No. 132-19 ¶ 17.

consistently called Membreno Spanish slurs for "gay" and "faggot." *See* ECF Nos. 132-1 at 9; 132-14 at 29. He also commented to her that she made "too much money for what she is" and that her breasts were too large to be, essentially, wasted on someone who is not a woman. ECF No. 132-1 at 9.

In January 2016, Lainez became Kitchen Manager with direct supervisory power over Membreno. ECF No. 125-21 ¶ 5. For the first several months of Lainez' tenure, Membreno viewed then General Manager Morris as offering her a modicum of protection from Lainez's harassment. ECF No. 125-2. But when Morris left in October 2016, Lainez approached Membreno and warned her that she "would not have anybody to protect [her]." ECF No. 132-14 at 79. She reported the incident to the restaurant's new General Manager, Pittman, but he took no action. ECF No. 132-1 at 18.

 Lainez also made significant changes to her schedule which diminished her earning capacity at the restaurant. *See* ECF No. 132-19 ¶¶ 6–7, 10. Beginning in 2015, Membreno conducted inventory with Lainez. *Id.* ¶ 5. Membreno willingly assumed this additional responsibility, as it was often a steppingstone to promotion. The extra hours also brought welcome increased income. *See* ECF No. 125-21 ¶ 11. Lainez attests that he chose Membreno for this role so as to "put [their] past behind" them and make Membreno his "right hand." *Id.* ¶¶ 10–11; ECF No. 125-4 at 34. Membreno, by contrast, attests that another manager, not Lainez, recommended her for the inventory shift. ECF No. 132-19 ¶ 8.

Accounts also differ significantly as to Membreno's time working this inventory shift. ECF No. 125-21 ¶¶ 11–16. Lainez maintains that Membreno had been late for nearly every early morning inventory shift for eight months. *Id.* ¶¶ 12–13. When Lainez confronted Membreno about her chronic lateness, Membreno lost her temper and announced she no longer wanted to

work the shift.  *Id.* ¶¶ 15–16.  Lainez promptly replaced Membreno with Miriam Fuentes, another cook.  *Id.*

In contrast, Membreno insists that she completed her duties well and on time.  ECF No. 132-19 ¶ 5.  Membreno also disputes that Lainez ever confronted her about her lateness and that the yelling incident ever happened.  *Id.*  Rather, Membreno attests that Lainez often arrived late for inventory check, leaving Membreno to wait outside.  *Id.*  Membreno further recounts that she was removed from inventory in September 2016 after she asked via text whether she could take an inventory day off.  ECF No. 132-19 ¶ 6.  Lainez initially agreed, but then removed Membreno from inventory duties and permanently cut her Tuesday shifts in their entirety.  *Id.*  Membreno reported the incident to either Morris or Pittman, both of whom claim not to recall any such conversation.  ECF Nos. 132-1 at 8, 18; 132-14 at 72–73; 125-4 at 8–9; 125-22 at 9–10.

Similarly, in 2016, Membreno requested to take off one Thursday.  Lainez granted Membreno's request but then never scheduled her again for a Thursday.  ECF No. 132-14 at 77–78.  In fact, Lainez cut back Membreno's schedule to working only two days per week, even though she made it known that she was available five days per week.  As a result, Membreno had to obtain outside employment to make ends meet.  *Id.* at 26–27, 77–78; ECF Nos. 132-17 at 8; 132-3 at 13–14.  Lainez, by contrast, attests that Membreno had been chronically displeased about working the "fry station" during her Thursday, and once declared she would rather be removed from a Thursday shift than work the "fry station."  ECF No. 125-21 ¶¶ 19-21.  Lainez points to this outburst as the reason why Membreno no longer was scheduled to work Thursday shifts.  *Id.* ¶¶ 21–23.  Membreno denies this incident ever occurred.  ECF No. 132-19 ¶¶ 9–10.

### C.  Membreno's Termination

On December 21, 2016, it appears that Membreno's struggles with Lainez came to a head.  Membreno had been scheduled to work Christmas Eve.  Because her father had plans to visit, Membreno texted Lainez to inform him that she could not work that shift.  ECF No. 125-21 ¶ 25.  Lainez, in response, asked Membreno about who would cover her shift.  *Id.* ¶ 26. According to Membreno, she had never been asked to find her own replacement, so she sought guidance from another supervisor.  *See* ECF Nos. 132-14 at 67–68; 132-1 at 19–20.  The other supervisor confirmed Membreno's understanding, leaving her with the impression that she followed proper procedure by texting Lainez days in advance, and that she need take no additional steps.  ECF Nos. 132-14 at 67–68; 132-1 at 19–20.  Membreno did not go in to work on December 24.  ECF No. 125-21 ¶ 28.

For the following week, Friday's supervisors did not place Membreno on the work schedule at all.  Membreno asked Pittman about why she was not scheduled to work, and Pittman promised to investigate the matter.  ECF No. 132-14 at 63–65.  Shortly after, during a meeting with Pittman and Lainez, Membreno learned she was fired.  ECF No. 132-19 ¶ 13.

After her termination, Membreno became depressed and anxious.  For a long time, she suffered from insomnia, loss of appetite, and prolonged crying jags.  To explain the connection between her symptoms and treatment at Friday's, Membreno offers the expert opinion of Jaclyn White Hughto, Ph.D., a public health expert in the epidemiological and bio-behavioral adverse effects of gender identity harassment and discrimination.  ECF No. 132-24 ¶¶ 5–6.  Dr. White concludes that the array of symptoms Membreno experienced are consistent with transgender individuals who have suffered the kind of harassment—name calling, exclusion from the restroom, physical assaults—as did Membreno.  *Id.* ¶¶ 28–32.

Defendants do not directly challenge Dr. White's conclusions.  Rather, they steadfastly maintain that Membreno's termination was warranted because she violated company policy by not working on Christmas Eve, leaving Lainez short-staffed and without sufficient time to find a replacement.  *See* ECF No. 125-21 ¶ 29.  According to Lainez, he learned that Membreno had bragged to others that she had decided not to work on Christmas Eve and they would now "know the power" she has within the organization.  ECF Nos. 125-21 ¶ 33; 125-23 at 3.  Lainez thus recommended Membreno's termination for failing to work her Christmas Eve shift as well as for insubordination and poor attitude.  ECF No. 125-21 ¶ 35.  Pittman, still maintaining he was unaware of any difficulties with Membreno, supported her termination.  ECF No. 132-9 at 16–17.

 Defendants further cite to Membreno's purported violation of company policy as grounds for her termination.  Defendants specifically contend that employees are required to put in writing any request for a day off in a "Request Off Book" two weeks in advance of the requested leave.  ECF No. 125-4 at 28–29.  If an employee needed to take time off after the schedule had already been released, then the employee must alert the manager and find someone to work the shift.  *Id.* at 29–30; ECF No. 132-2 at 16–17.  Additionally, Morris testified to the existence of a "holiday bid sheet" which all employees were expected to use so that management could balance employees' needs for time off with coverage of holiday shifts.  ECF No. 125-4 at 22–24.  The Jackmont Handbook further states that failure to notify a supervisor of an unscheduled absence "may result in discipline, up to and including termination."  ECF No. 132-7 at 19.

In contrast, Membreno and other employees attest to a very different policy and practice.  They confirm that time off was requested either by speaking to or texting a manager, as

Membreno had done for the Christmas Eve shift.  ECF Nos. 132-2 at 16; 132-14 at 55–58.  Once

an employee notified the manager, the supervisor—not the employee—would find a replacement

and ensure the shift was covered.  *See* ECF No. 132-14 at 59.  In fact, Membreno highlights that

the Jackmont Handbook itself restricts employees from finding their own shift replacements.

ECF No. 132-7 at 26.  Employees also report having never even seen the "holiday bid sheet"

before.  ECF Nos. 132-11 at 9; 132-10 at 8; 132-2 at 17.  And yet others testified that they either

did not know about the existence of the "Request Off Book" or did not usually use it.  ECF No.

132-10 at 7; 132-11 at 6–7.  The Jackmont Handbook further corroborates that a "no call/no

show," or an unscheduled absence from work will first result in counseling, and that the

corporation considers an employee "to have voluntarily resigned from employment" after three

consecutive missed shifts.  ECF No. 132-7 at 11.  *See also* ECF Nos. 132-9 at 8; 125-4 at 33.

Additionally, Membreno cites to three other non-transgender employees who had

received adverse "write-ups" for failing to work a scheduled shift but were not fired.  ECF Nos.

132-28; 132-29; 132-30.  As for insubordination, Membreno highlights that another non-

transgender coworker, Fredy Hernandez, had been late to work, "more times than not," and had

been disciplined for insubordination.  ECF No. 132-9 at 8–9.  But he, unlike Membreno, received

warnings, a writeup, and a suspension.  *Id.* at 11–12; ECF No. 132-2 at 13–14.

Defendants have also presented evidence of the company's anti-discrimination and anti-

harassment policy, which it contends all employees receive.  ECF No. 125-8 ¶¶ 12–15.

Membreno recalls receiving a book outlining the policy in English, although she says she did not

understand most of it because her first language is Spanish.  ECF No. 132-19 ¶ 14.  The policy

and related signage are posted on the Friday's employee bulletin board and include contact

information for local and corporate management members to whom employees may raise

concerns.  ECF No. 125-8 ¶ 14.  Although Membreno testified to alerting her General Managers and other supervisors regarding the harassment she suffered, Morris did not recall ever hearing about hostile comments directed to Membreno.  ECF No. 125-4 at 8.  Pittman similarly recalls having conversations with Membreno after certain incidents but draws a blank on the substance of the conversations.  *See* ECF No. 125-22 at 9–11.

### D.  Membreno's Formal Discrimination Charge

Shortly after her termination, Membreno timely filed a charge of discrimination on March 15, 2017, based on sex and gender identity both with the Maryland Commission on Civil Rights ("MCCR"), and the federal Equal Employment Opportunity Commission ("EEOC").  ECF No. 125-2.  Membreno did not separately file a formal charge with the Montgomery County Office of Human Rights ("MCOHR").  ECF No. 132 at 27–28.

On December 21, 2018, Membreno filed suit in the Circuit Court for Montgomery County against Defendants, alleging violations of the Montgomery County Human Rights Act ("MCHRA") and the Maryland Fair Employment Practices Act ("MFEPA").  ECF No. 1-1.  Defendants timely noted removal to this Court based on diversity jurisdiction.  ECF No. 1-4.  In response, Membreno moved to remand the action.  ECF No. 13.  ARP answered the Complaint (ECF No. 2), and Defendants Jackmont Administrative and Jackmont Hospitality (collectively, the "Jackmont Defendants") moved to dismiss the Complaint for failure to state a claim.  ECF No. 12.  Membreno moved to amend her Complaint in response to the Jackmont Defendants' motion to dismiss.  ECF No. 21.  The Court denied Defendants' motion to dismiss and the motion to remand but permitted Membreno to amend her complaint.  ECF No. 32.

In the Amended Complaint, Membreno avers that Defendants engaged in sex and gender identity discrimination in violation of the MCHRA, Montgomery Cnty. Code § 27-19 and the MFEPA, Md. Code Ann., State Gov't § 20-606 (Counts I, III, V, VII).  ECF No. 37.  Membreno

further contends that Defendants created a hostile work environment based on gender and sex in violation of the MCHRA and the MFEPA (Count II, IV, VI, VIII).  *Id.*  After a lengthy and contentious discovery period, Defendants now move for summary judgment on all claims.  ECF No. 125.  Because genuine issues of disputed material fact exist as to the discrimination and hostile work environment claims, the motion must be denied.

## II.  Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  Importantly, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)).  Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted.  *Celotex*, 477 U.S. at 322.

Employing this standard, the Court addresses the propriety of summary judgment as to Membreno's claims.

## III. Analysis

### A. Applicable Substantive Law

The Court begins with the applicable law governing Membreno's discrimination and hostile work environment claims.  Although Membreno pursues each liability theory under local and state discrimination statutes, the court looks to federal Title VII law for guidance.  As the MFEPA is the "the state law analogue of Title VII," *Alexander v. Marriott Int'l, Inc.*, No. RWT-09-2402, 2011 WL 1231029, at *6 (D. Md. March 29, 2011), the Court may import Title VII law into the analyses unless Maryland law clearly differs.  *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012); *Eubanks v. Mercy Medical Center, Inc.*, WDQ-15-513, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015).  *See also Molesworth v. Brandon*, 341 Md. 621, 632–33 (1996); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494 (1990); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n. 8 (2013).  The same is true of claims brought pursuant to the MCHRA.  *Whittaker v. David's Beautiful People, Inc.*, No. DKC-14-2483, 2016 WL 429963, at *2 (D. Md. Feb. 4, 2016) ("Maryland courts construe . . . claims [under the MCHRA] similarly to those made under Title VII.").  For ease of analysis, the Court next reviews the substantive elements for each theory of relief.

#### 1. Discrimination Based on Gender Identity

With regard to Membreno's alleged discriminatory termination, Membreno bears the burden of establishing a prima facie case by demonstrating that she: (1) "is a member of a protected group; (2) [] suffered adverse employment action; (3) [] was performing her job duties at a level that met [her] employer's legitimate expectations at the time of the adverse

employment action; and (4) the position remained open or was filled by similarly qualified applicants outside of the protected class." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). However, where the fourth prong "does not shed any light on whether the employer treated the plaintiff adversely on account of discriminatory animus, the plaintiff is relieved of such burden." *Witherspoon v. Brennan*, 449 F. Supp. 3d 491, 502 (D. Md. 2020) (citing *Miles v. Dell*, 429 F.3d 480, 488 (4th Cir. 2005)).

Membreno brings claims of discrimination based on her gender identity and sex. When a plaintiff raises allegations of discrimination based on her transgender status, the elements of the sex and gender identity discrimination claims are the same. She must demonstrate that she was terminated because of her gender identity. *See Schwenke v. Ass'n of Writers & Writing Programs*, No. DKC-20-1234, 2021 WL 22422, at *3 (D. Md. Jan. 4, 2021). If Membreno establishes the prima facia case, the burden then shifts to Defendants to offer a legitimate, non-discriminatory reason for Plaintiff's termination. If Defendants can do so, the burden then shifts back to Membreno to produce sufficient evidence to raise a genuine issue of fact as to whether Defendants' rationale is pretextual. *See E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996). To demonstrate pretext, a plaintiff must offer evidence "*both* that the [Employers'] reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

### 2. Hostile Work Environment

To establish a hostile work environment claim, Membreno must show that: (1) she experienced unwelcome misconduct (2) based on her sex or gender identity that was (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive

atmosphere and (4) is imputable to Defendants.  *See Finnegan v. Dep't of Pub. Safety & Corr. Servs.*, 184 F. Supp. 2d 457, 462 (D. Md. 2002); *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011).  A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  In contrast, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (citation omitted).  Membreno must show that the conduct was both subjectively and objectively offensive to prevail on the hostile work environment claim.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. at 21–22.  "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"  *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998) (quoting *Harris,* 510 U.S. at 23).

Defendants lodge an array of challenges, both procedural and substantive.  The Court discusses each in turn.

## B.  Procedural Challenges

### 1.  Statute of Limitations

Defendants first argue that Membreno's claims cannot be based on any conduct that occurred more than 300 days before she filed her formal discrimination charge on March 15, 2017.  ECF No. 125 at 19–20 (quoting *Van Slyke v. Northrop Grumman Corp.,* 115 F. Supp. 2d 587, 592 (D. Md. 2000)).  Title VII provides that an employment discrimination charge must be filed with a state or local agency "within three hundred (300) days after the alleged unlawful

employment practice occurred."  42 U.S.C. § 2000-5(e)(1).  But Defendants look to the wrong authority.  State statutes of limitations apply to state claims brought in federal court.  *McCray v. Maryland Dep't of Transp.*, No. ELH-11-3732, 2014 WL 4660793, at \*14 (D. Md. Sept. 16, 2014) (citing *Erie R. R. Co. Tompkins*, 304 U.S. 64 (1938)).  The relevant MFEPA provision at the time required that the charge "be filed within 6 months after the date on which the alleged discriminatory act occurred."  Md. Code Ann., State Gov't § 20-1004(c)(1) (2009).  The MCHRA provides that suit must be filed "within one year of the alleged discriminatory act or practice" and if the alleged acts are "continuing in nature . . . must be filed within one year after the most recent act or practice." Montgomery Cnty. Code § 27-7(d).

A Plaintiff may not recover for "discrete acts of discrimination," "such as termination, failure to promote, denial of transfer, or refusal to hire" that occur outside of the statute of limitations window.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 114 (2002). Nonetheless, incidents that took place beyond the limitations period may still "provide relevant evidence" and may be "background facts that may be the subject of discovery and evidence permitted at trial."  *Evans v. Maryland Nat'l Capital Parks & Planning Comm'n*, No. TDC-19-2651, 2020 WL 6703718, at \*3 (D. Md. Nov. 13, 2020) (citing *Morgan*, 536 U.S. at 113).

Membreno's termination is at the heart of her discrimination claims.  Defendants fired Membreno on January 4, 2017.  ECF No. 132-19.  Membreno, in turn, filed her formal charge with the MCCR and EEOC on March 15, 2017, within six months of her termination.  ECF No. 125-2.  Thus, the discrimination claims are timely.  Whether events predating the respective limitations periods are admissible as relevant evidence at trial may be the subject of separate *in limine* challenges, but will not preclude Membreno's discrimination discharge claim from

moving forward.  *Evans*, 2020 WL 6703718, at *3; *Morgan*, 536 U.S. at 113 (Title VII does not

"bar an employee from using prior acts as background evidence in support of a timely claim.").

Membreno's hostile work environment claims also survive challenge.  The Court

recognizes that often such claims take place over "a series of days or perhaps years" and are thus

"different in kind from discrete acts."  *Morgan*, 536 U.S. at 103, 115.  Accordingly, where "an

act contributing to the claim occurs within the filing period, the entire time period of the hostile

environment may be considered for purposes of determining liability."  *Id.* at 105.  *See also*

Montgomery Cnty. Code § 27-7(d) (Where "acts or practices are continuing in nature, the

[charge] must be filed within one year after the most recent practice.").  "Whether a series of acts

constitutes a single actionable claim depends on whether the acts are sufficiently related, and

whether there has been 'certain intervening action by the employer.'"  *E.E.O.C. v. Xerxes Corp*.,

No. CCB-08-1882, 2011 WL 5157774, at *1 (D. Md. Oct. 28, 2011).

When viewing the record most favorably to Membreno, she has clearly marshaled

sufficient evidence that at the time of her termination, she had experienced a pattern of hostility

aimed at her transgendered status.  Most relevant here, Lainez, the very supervisor responsible

for her termination, began taking aim at Membreno when they were line cooks in 2008 and

continued until her termination in 2017.  *See* ECF Nos. 132-19; 132-1 at 9–10.  His conduct

included misgendering her, physically assaulting and threatening her, and, once he had the

power, altering her schedule.  ECF No. 132-1 at 9–10.  Further, the record evidence, viewed

most favorably to Membreno, supports that she has endured contemporaneous and similar

harassment for years.  When coworkers harassed her, she notified supervisors to no avail.  *See*

ECF Nos. 132-1 at 17–18.  This came as no surprise to Membreno given that her General

Manager, Headen, consistently berated and insulted her, making her suffer such indignities as not

even being able to use the bathroom in peace.  ECF No. 132-1 at 8–9.  On this record, the hostile work environment claim suffers from no statute of limitations impediment.

Defendants, in response, press that Membreno's seven-month hiatus from the Silver Spring Friday's in 2014 constitutes an "intervening act" sufficient to sever the two periods of alleged harassment for limitations purposes.  ECF No. 141 at 10.  In support, Defendants argue that *Holmes v. Utah Dep't of Workforce Servs.*, 483 F.3d 1057, 1064 (10th Cir. 2007) stands for the proposition that voluntary separations from employment for a sufficiently long period may defeat a continuing violation claim.  *Holmes* is neither binding nor persuasive to this Court.  For one, the plaintiff in *Holmes* alleged the instances of harassment were separated by a longer period than here and occurring under very different circumstances.  483 F.3d at 1063–64.  The plaintiff in *Holmes,* for example, left the division where her supervisor had harassed her, and then sought to pull this historic misconduct under the "continuing violation" umbrella by averring that the same supervisor "hugged" her once on a visit to her old work friends roughly 18 months later.  *Id.* at 1063.  The *Holmes* Court affirmed the grant of summary judgment, in part because Plaintiff failed to generate sufficient evidence to tie the second "hug" to the prior, untimely incidents of harassment.  *Id.*

By contrast, Membreno has generated sufficient evidence from which a reasonable trier of fact could conclude that she endured the same pattern of harassment before and after her hiatus, and committed by the same supervisor, Lainez.  The record certainly supports Lainez's offensive and even assaultive behavior aimed at Membreno before 2014 on account of her gender identity.  Similarly, after Membreno returned Lainez became Kitchen Manager and, upon Morris' departure, announced that Membreno would no longer "have anybody to protect her."  Lainez further deprived Membreno of shifts and held her to an exacting standard when seeking

time off that was not likewise applied to non-transgender employees. Lainez also continued to pepper Membreno with rude and derogatory comments aimed at her status, calling her a "faggot" in Spanish, noting that she made too much money "for what she is." ECF No. 132-1 at 9. On this record, the hostile work environment claim is not defeated by Membreno's brief hiatus.

### 2. Failure to Exhaust Administrative Remedies

Defendants next argue that Membreno cannot pursue any claims not properly set forth in the formal charge that she filed with the EEOC and MCCR. ECF No. 125 at 22–23. To be sure, the formal charge defines the contours of the claims that may proceed in an eventual civil suit. *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (internal quotation marks omitted), *abrogated on other grounds by Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843 (2019). Accordingly, where the plaintiff brings a formal charge that differs in "time frames, actors, and discriminatory conduct" from the "central factual allegations" averred in her lawsuit, Plaintiff has failed to exhaust the claim administratively. *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012) (quoting *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005)).

To assess whether the plaintiff has exhausted her claims, the Court must ascertain whether the filed claims are reasonably related to those raised in the administrative charge and "can be expected to follow from a reasonable administrative investigation." *Sydnor*, 681 F.3d at 594–95 (citation omitted). Importantly, the administrative charge need not be "precisely the same" as that filed in the eventual suit. *Sydnor*, 681 F.3d at 594–95 (citation omitted); *accord Johnson v. SecTek, Inc.*, No. ELH-13-3798, 2015 WL 502963, at *4 (D. Md. Feb. 4, 2015). Where "allegations in the complaint match the discriminatory bases and kinds of liability alleged in the EEOC charge," a plaintiff has sufficiently exhausted her administrative remedies. *Johnson*, 2015 WL 502963, at *5 (collecting cases). This is so because procedural requirements

"should not become a tripwire for hapless plaintiffs" as the remedial scheme must be one "in which laypersons, rather than lawyers, are expected to initiate the process."  *Sydnor*, 681 F.3d at 594.

The Court concludes that Membreno's formal charge has preserved both her discrimination and hostile work environment claims.  The charge states:

> Upon hiring, Respondent became aware that I am a transgender woman.  Shortly after my hire, I began to be harassed and treated differently than my non transgendered counterparts.  Mr. Lainez would often call me derogatory names like "faggot" and I was prohibited from using the restroom that I identified with. From 2011 until October 2016, although still being subjected to harassment, I was somewhat protected by Mark Morris, General Manager, who tried to prevent the discriminatory practices.

 ECF No. 132-34.

The charge next details the circumstances surrounding her termination and her disparate treatment as compared to her "non-transgendered counterparts."  *Id.*  Membreno concludes the narrative by expressly stating that she has been the victim of "harassment, hostile work environment . . . due to my gender identity."  *Id.*

As framed, the formal charge is sufficiently broad.  It puts Defendants on notice that Membreno experienced years of discrimination and harassment from the moment she was hired in 2007.  ECF No. 125-2.  Although Membreno notes that the harassment had been most severe between 2011 and 2016, she also clearly states that her termination was the culmination of the harassment and hostility she faced as a transgender employee throughout.  This provides to Defendants sufficient notice to investigate and remediate all of the alleged misconduct which its employees and supervisors levelled at Membreno.  *Cf. Smith v. First Union Nat. Bank*, 202 F.3d 234, 247–48 (4th Cir. 2000) (allegations of different forms of retaliation by "management" reasonably related and would follow from reasonable investigation).  On this record, the Court

finds that Membreno's formal charge is sufficiently related to her claims pursued here. Defendants' motion must be denied.

### 3.   Failure to Exhaust Remedies on MCHRA Claims (Count I-IV)

Defendants level a narrower statutory challenge to Membreno's county discrimination claims which is equally unavailing.  Defendants contend that Membreno's county claims must fail because she never filed a formal charge with the MCOHR.  ECF No. 125 at 23–24.  The critical flaw in Defendants' argument is that the County code does not require filing a separate charge where, as here, the Plaintiff files either an EEOC or Maryland state charge.

The Maryland Code, § 20-1202 (c)(2)(i), makes clear that a plaintiff may file a discrimination suit "no sooner than 45 days after the plaintiff filed a complaint with the county unit responsible for handling violations of the county discrimination code."  Thus, say Defendants, because Membreno never filed a county charge, she cannot satisfy this state precondition to suit.  But the MCHRA makes clear that "[f]iling with any federal or state agency charged with civil rights enforcement *constitutes a filing under this article*."  Montgomery Cnty. Code § 27-7(d) (emphasis added).  Accordingly, because Membreno filed a formal charge with the MCCR, which was cross-filed with the EEOC, the Montgomery County code automatically treats that filing as "a filing under this article."  *Id.*  Membreno thereafter filed suit in Montgomery County Circuit Court well beyond the 45-day waiting period.  ECF No. 1-1.  Thus, she has exhausted her county claims.

Defendants urge, however, that *Rachel-Smith v. FTData, Inc.*, 247 F. Supp. 2d 734, 743 (D. Md. 2003) and *Reed v. Innovative Management Strategists, Inc.,* 2017 WL 193528, at *4 (D. Md. Jan. 18, 2017), compel a different conclusion.  ECF No. 141 at 7.  Defendants misread the import of these decisions.  In *Rachel-Smith,* the Court was called to pass on whether a formal

charge filed with the EEOC would be automatically cross-filed with the Prince George's County

Fair Employment Practices Agency for purposes of preserving a Prince George's County

statutory discrimination claim.  Looking to the particulars of the interagency agreements

applicable to that county, the Court concluded that no reasonable filer could have assumed that

filing an EEOC charge constitutes cross-filing with the Prince George's County Human Rights

Commission.  *Rachel-Smith*, 247 F.Supp.2d at 744.  Likewise, in *Reed*, the Court reviewed

whether the EEOC filing constituted a formal cross-filing with the county when the Plaintiff

failed to so designate.  2017 WL 193528, at *6.  Neither case calls into question the

unambiguous Montgomery County code provision which allows Membreno to satisfy exhaustion

by filing a formal charge with the state or federal analog.

Defendants alternatively argue that to read the Montgomery County provision as this

Court does would improperly "override" the statutory requirements of the Maryland Code, § 20-

1202.  ECF No. 141 at 6.  But the Montgomery County provision, read accordingly, does not

conflict or "override" the state's 45-day waiting period.  Rather, it makes clear that for the

County's purposes, a charge filed with either EEOC or MCCR is treated as if the charge were

filed with MCOHR.  Then, once 45 days has elapsed, an aggrieved person may file a civil

complaint.  Md. Code. Ann., State Gov't § 20-1202(c)(2)(i).  This reading is not only clear and

unassailable; it supports the "important" goal of "provid[ing] full protection of the law to

[Maryland] citizens" by way of "allowing private causes of action for violations of certain

country discrimination laws."  *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 218–23

(2012) (citing *Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 628–29 (2010))

(quoting 1992 Md. Laws 3446).  *See also Edwards Sys. Tech. v. Corbin*, 379 Md. 278, 298

(2004) (purpose of statute is to empower counties "to prohibit discrimination occurring in the

county, to define the elements of a claim by one injured by such discrimination, to provide for an adjudicatory administrative proceeding by which the injured party may obtain relief, and to provide for a traditional judicial review action").

In sum, none of Defendants' exhaustion or limitations challenges withstand scrutiny. The Court thus turns to Defendants' challenges to the sufficiency of the evidence for the discrimination and hostile work environment claims.

### C. Challenges Based on Sufficiency of Evidence

#### 1. Discrimination Claims (Counts I, III, V, VII)

Defendants maintain that summary judgment is warranted because no evidence supports a prima facie case of discrimination. The Court disagrees. It is beyond dispute that Membreno, as a transgender woman, is part of protected class and that she suffered adverse employment action. Further, ample evidence supports that at the time she was discharged, Membreno fulfilled her job duties exceptionally well. *See, e.g.*, ECF No. 132-10 at 5; 132-5 at 7. Finally, sufficient facts allow a reasonable juror to conclude that Membreno was terminated on account of her transgender status.[3] Thus, Membreno's case may proceed.

Defendants next maintain that no evidence exists to rebut their non-discriminatory reason for firing Membreno. Defendants argue that they fired Membreno because she was insubordinate and failed to show up for or secure a replacement for her scheduled Christmas Eve shift. ECF No. 125 at 24–25. Accordingly, her direct violation of company policy supported her termination. *Id.*

---

[3]     As to the fourth prong of the prima facie case—whether Defendants replaced Membreno with a similarly situated employee in a non-protected class—Defendants destroyed personnel records relevant to this question which Magistrate Judge Sullivan found sufficiently willful to warrant sanctions. ECF Nos. 149–50. *See also Witherspoon v. Brennan*, 449 F. Supp. 3d 491, 502 (D. Md. 2020). In these circumstances, Membreno's inability to address the fourth prong will not be held against her. This is especially warranted when considering the likelihood that Defendants willful conduct will be the subject of an adverse jury instruction. ECF Nos. 149–50.

But Membreno clearly has marshaled sufficient evidence to demonstrate this stated reason was pretextual.  Contrary to the claimed policies, evidence reflects that few employees followed the very procedures on which Defendants now rely.  *See* ECF Nos. 132-10 at 7; 132-11 at 6–7.  Further, employees corroborate that Membreno alerted Lainez of her inability to cover the Christmas Eve shift in the same way that other employees have requested time off.  *See* ECF Nos. 132-2 at 16; 132-14 at 55–58; 132-11 at 6.

Moreover, Membreno has demonstrated that other non-transgender employees who similarly missed a shift without permission had been reprimanded, not terminated.  ECF Nos. 132-27; 132-28; 132-29.  Such leniency had been accorded employees who violated the purported "no call/no show" policy on multiple occasions.  *Id.*; *see* ECF No. 132-9 at 8–9.  On this record, a reasonable factfinder could conclude that Defendants' stated reasons for firing Membreno functioned as a pretext for firing her on account of her transgender status.  Summary judgment as to the discriminatory discharge claims is therefore denied.

### 2.   Hostile Work Environment Claims (Counts II, IV, VI, VIII)

Defendants' challenge to Membreno's hostile work environment claims fare no better.  Defendants specifically contend that Membreno cannot demonstrate that she withstood sufficiently severe or pervasive conduct to sustain the claim.  ECF No. 125 at 29–34.  But on this Membreno has generated ample evidence.  Since her hiring in 2007, employees and supervisors ridiculed and mocked Membreno on account of her transgender status.  Lainez, who ultimately had her fired, physically assaulted her an called her a "faggot."  ECF No. 132-14 at 12–14.  Lainez and others questioned her about how a man could ever be attracted to her.  ECF No. 132-1 at 9–11.  She was ridiculed and demeaned when she used the ladies' bathroom to the point that she would avoid relieving herself.  *See* ECF No. 132-1 at 8-9.  She was purposely

outed to new staff and called "Jose" in person, in the scheduling system, and even on published shift assignments. *Id.*

Moreover, Membreno's reporting the harassing behavior to supervisors made no difference. *See* ECF No. 132-1 at 18. Apart from a select few supervisors and friends, and for a brief period when she worked at another Fridays, this derisive behavior went unchecked. On this record, a reasonable factfinder could conclude that the persistent "personal gender-based remarks that single out individuals for ridicule" were sufficient to create a hostile work environment for Membreno. *EEOC v. Fairbrook Med. Clinic*, 609 F.3d 320, 328–29 (4th Cir. 2010); *see also Jennings v. Univ. of N. Carolina,* 482 F.3d 686, 699 (4th Cir. 2007) ("[D]egrading and humiliating conduct" can establish severe of pervasive discrimination).

Sufficient evidence also exists that as a result of this pervasive harassment, Membreno's conditions of employment were materially altered. She lost shifts and days at work. She was physically assaulted and made to avoid using the restroom for fear of further reprisal. *See* ECF Nos. 131-1 at 8–10; 132-19. Indeed, Lainez—one of the worst offenders—specifically recommended her termination under questionable circumstances. On this record, the Court easily concludes that evidence exists to sustain the hostile work environment claims.

Defendants separately maintain that summary judgment must be granted in their favor because the corporation indisputably "exercised reasonable care to prevent and correct promptly any [] harassing behavior" and that Membreno "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." ECF No. 125 at 35. In doing so, Defendants seek to avail themselves of the affirmative defense articulated in *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). This affirmative defense may be supported by an

employer's non-discrimination policy as evidence that the "employer exercised reasonable care to prevent and promptly correct harassment" so long as the policy is both "reasonably designed and reasonably effectual." *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999). But this defense may not be available where "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808.

Even assuming this defense remains viable, the evidence points in both directions. Defendants certainly maintained a written anti-discrimination policy that they assert Membreno did not follow. But the record also reflects that when she did report instances of abuse or harassment, Defendants' management staff did nothing. *See* ECF Nos. 132-14 at 14-15 (notifying a kitchen manager after Lainez's assault); 132-1 at 18 (notifying GMs Morris and Pittman about Lainez removing days from schedule. *But see* ECF No. 125-4 Tr. 8–9, 12–13 (Morris denies hearing of any harassment). Defendants' assertion that Membreno should have done more to report the abuse to her chain of command is further complicated when considering that for long stretches *her abusers were also her supervisors*. In short, the Court cannot conclude as a matter of law that the existence of a non-discrimination policy absolves Defendants of liability.

### D. Damages

Defendants lastly argue that Membreno's claims fail because she has marshaled no evidence of damages. ECF No. 125 at 36–37. Notably, Membreno seeks economic damages such as lost wages. ECF No. 37 at 22. She also attests that after she was terminated, she suffered from crying jags, insomnia, loss of appetite and other symptoms of emotional distress. [4] *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 546 (4th Cir. 2003) (citing *Price v. City*

---

[4]     Membreno's symptoms in this respect are not disputed. *See* ECF Nos. 125 at 36; 132 at 10.

*of Charlotte*, 93 F.3d 1241, 1251 (4th Cir.1996)).  Membreno has tied these emotional damages specifically to the abuse she endured at Friday's.  *See* ECF No. 132-24 ¶¶ 28–32.  Thus, she has generated sufficient evidence to proceed on several damages theories.  *See McClam v. City of Norfolk Police Dep't*, 877 F. Supp. 277, 284 (E.D. Va. 1995) (Awarding compensatory damages for humiliation where employee *"*testified about having headaches, feelings of not wanting to come to work and other changes in attitude and devotion to his job, a lowering of his self-esteem, as well as difficulty sleeping").  Her testimony, corroborated by friends and family, and buttressed by Dr. White, establishes a sufficient "causal connection between the violation and her emotional distress*."  Bryant*, 93 F.3d at 1421 (citing *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 653 (4th Cir. 2002)).[5]

## IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied.

A separate order follows.

| | |
|---|---|
| ___2/5/2021___ | _____/S/_____ |
| Date | Paula Xinis |
| | United States District Judge |

---

[5]  Defendants also summarily contend that because Membreno marshaled no evidence "to warrant an award of <u>any</u> damages, let alone punitive damages," she cannot demonstrate that Defendants "knew directly or by imputation that [they] may have been acting in violation of Plaintiff's federally protected rights," sufficient to warrant punitive damages.  ECF No. 125 at 37 (emphasis in original).  Clearly evidence exists to demonstrate that Defendants knew, by imputation from its managers, that Membreno had suffered harassment and discrimination on account of her transgender status.  *See* ECF No. 132-1 at 18; 132-14 at 15; 125-22 at 10.  The Court will not prevent Membreno at trial from seeking punitive damages if the trial record supports such an instruction.  *Cf. Hanna v. Emergency Med. Assocs., P.A.*, 77 Md. App. 595, 611 (1989) (citing *Henderson v. Maryland Nat. Bank*, 278 Md. 514, 519 (1976)) (holding punitive damages available for violations of Montgomery County discrimination statute).